# CASES DETERMINED

IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY.

### FEBRUARY TERM, 1886.

STATE, THE CENTRAL RAILROAD COMPANY OF NEW JER- $\boxed{\begin{array}{cc} 48 & 1 \\ 65 & 612 \end{array}}$
SEY, PROSECUTORS, v. STATE BOARD OF ASSESSORS
ET AL.

1. A separate, independent property tax cannot, under the constitution
of this state, be put on property arbitrarily selected for the purpose,
and set apart from other property of the same kind.
2. The constitutional amendment that requires that property shall be as-
sessed for taxes under general laws, and by uniform rules, prohibits the
selection, simply at the legislative will, of the property of two classes
of corporations, separating it from the mass of similar property, and
imposing an exclusive tax on the property so selected.
3. A property tax for state purposes, imposed on the lands and tangible
personal property used by railroad and canal companies, and on their
franchises, such tax touching no other property, declared unconstitu-
tional.

Writs of *certiorari* were taken on behalf of the Central
Railroad Company of New Jersey and thirty-three other rail-
road corporations, and designed to correct and set aside the
assessments and valuations made by the state board of assess-

ors of the property of the said railroads, under the provisions of the act of the legislature entitled " An act for the taxing of railroads and canal property," approved April 10th, 1884.

The several cases were by consent argued together. The facts appear fully in the opinion of the court.

Argued at November Term, 1885, before BEASLEY, CHIEF JUSTICE, and Justices KNAPP and MAGIE.

For the prosecutors, *R. W. De Forest, Joseph D. Bedle, Geo. M. Robeson, Thomas N. McCarter* and *B. Williamson.*

For the defendants, *John P. Stockton,* Attorney-General, and *Barker Gummere.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The importance of this case is apparent. A large part of the revenue of the state derived from the taxes is involved, as well as one of the most valuable of the safeguards erected by the constitution for the protection of property. Deeply impressed with this consideration, the court has given to the subject all the time, care and attention at its command.

The questions to be decided take their rise in the statute, passed in the year 1884, entitled " An act for the taxation of railroad and canal property." The principal provisions of this law, which are pertinent to the present purpose, are to the following effect :

In the first place it declares, generally, that all the property of any railroad or canal property, not used for railroad or canal purposes, shall be assessed and taxed by the same assessors, and in the same manner, and at the same rate, as the taxable property of other owners in the same municipal division or taxing district ; that all property of any railroad and any canal property, used for railroad or canal purposes, shall be assessed by a state board of assessors, who are required to ascertain the true value of all property, used for railroad or

canal purposes, of each railroad and of each canal company in this state, including its franchises, and to ascertain separately :

1. The value of the main stem.

2. The value of the real estate other than main stem, including road-bed and tracks outside of the one hundred feet, all buildings other than depot buildings used for passengers, all water tanks, water works, riparian rights, docks, wharves and piers.

3. The value of all tangible personal property.

4. The value of the franchise.

The term "main stem" is defined to include the road-bed, not exceeding one hundred feet in width, with its rails and sleepers, and depot buildings ; and the term "water-way" to include the towing-path and berme bank ; and the term "tangible personal property" to include the rolling stock, cars, locomotives, ferry-boats, all machinery, tools and other tangible personal property of any railroad company, and the tangible personal property of any canal company. It is then provided that upon the completion of their valuation the board shall compute the tax upon the entire assessed valuation of each railroad company, and of each canal company, as ascertained by them ; that upon such valuation each company shall pay, for state purposes, at the rate of one-half of one per cent., annually, upon each dollar of valuation, and that said board shall compute the same ; each company shall also pay, in addition to said tax of one-half of one per cent., a tax, at the local rate as fixed and assessed for county and municipal purposes upon other property in each taxing district, upon the valuation of its property in the several taxing districts, separately valued and assessed under the provisions of subdivision 2 of section 3 of the act, the last-mentioned rate in no case to exceed one per cent. of the valuation of the property valued under the provisions of subdivision 2 of section 3 of the act.

An assessment having been made, by virtue of this act, upon the property of the Central Railroad Company of New

Jersey, a *certiorari* was applied for and allowed, and in this mode the matter has been placed under the consideration of this court.

As there were many others of the corporations of this kind in the same situation as the plaintiff, and as all these parties proposed to raise against these tax proceedings certain objections that were fundamental and were common to them all, the arguments of the respective counsel, by the direction of the court, were confined, for the time, to the discussion of such objections. It will be this class of questions only that will be considered and decided at the present time.

But before entering upon that inquiry it will be necessary to premise an examination of a proposition advanced by the state ; for, if that proposition is to be sustained, the court would be dispensed from the consideration of the rest of the topics embraced in the argument.

The proposition referred to was, in substance, this : that every railroad company created under the laws of this state was subjected, by the terms of its charter, to special annual taxation at the will of the legislature. This position is thus expressed in the brief of counsel : " Annual taxation is a condition of the corporate existence of railroad corporations." " The charter of every railroad corporation which has been specially enacted by the State of New Jersey contains the condition that it shall pay an annual tax upon its property, wholly irrespective of the fact whether any other property was taxed or not taxed in any such year."

The condition thus referred to as it is to be read in the charter of the Central Railroad Company, and which is typical of this class of clauses, is in the words following, viz. : " That it shall be the duty of the treasurer of said company, on, &c., to pay to the treasurer of this state a tax of one-half of one per centum upon the cost of said road, &c., provided that no other tax or impost shall be levied or assessed upon the said company." This charter, as well as all others of its class, was taken " subject to alteration, suspension and repeal, in the discretion of the legislature."

From these premises it was argued, by the counsel in behalf of the state, that this act of 1884, which imposes the taxes in dispute, as well as the antecedent acts of 1873 and 1876, "are not," in the language of the brief, " acts imposing taxes upon railroad corporations, or classifying their property for taxation, but are acts amending the charters of all pre-existing corporations, whether granted by special acts or by the general railroad law, and increasing the amount of tax already imposed on them by their respective charters and the general railroad law, as conditions of their corporate privileges and existence."

It will therefore be observed, from the foregoing statement, that the proposition is this : given the stipulation of the railroad company to pay a certain fixed rate annually in lieu of all other taxes, and the reservation of a power in the state to repeal or modify the charter, the consequence follows that the state can at will increase to any extent the annual rate. In other words, that instead of one-half of one per cent. the company can be required to pay annually at the rate of ten or twenty per cent., or at any higher rate.

The statement of the proposition in this uncircumstantial form seems to show the impossibility of its correctness. If it be true, then the power to modify is the power to confiscate; for it is obvious, on the supposition of its truth, that almost the entire body of corporate property existing by the laws of this state would be held simply by the tenure of public sufferance. We do not think that this is the true interpretation of the situation. The amount of annual payments called for by these charters is a conventional amount, agreed to for the time being by the state on the one side and the corporation on the other, and the power to modify the charter does not carry with it the right to interpolate a new term into the contract on the part of the company It is not credible that either of the parties to this arrangement believed that the prodigious prerogative now claimed was, by the inherent force of such arrangement, conferred upon the state. The structure of the clause refuses to form a basis for such a theory. It im-

poses a duty on the company to pay annually a fixed amount, and then follows a proviso that no other tax shall be levied. But what office has this proviso if the amount to be paid can be indefinitely increased? It is, in form, a limitation, but, in effect, on the construction claimed, it is absurd, for it would stand as an attempt to limit the limitless. If it be true that the state can take directly from the company in each year what it pleases, it could not be a matter worth a moment's thought or a line of prevention, in what mode such exaction should be made.

Nor is the hypothesis sustained by reason of any force inherent in the power, reserved to the state, to alter or repeal this charter. The charter consists properly of the powers and franchises granted by the sovereignty, and the power to repeal or alter the charter is simply a power to take away or modify such franchises. It does not suggest in the faintest manner that the state, under such a reservation, can invade in any respect the proprietary rights of the company, much less seize its possessions, or any of them, and sequester them to the public use. When one of the sections of this charter declares that "the railroad or roads, and their appendages, and the land over which the same shall pass, and all other property whatsoever, belonging to the said company," &c., are hereby vested in said company, it seems to us altogether unreasonable to predicate that under the reserved right to modify the charter, this clause can be so transformed as to substitute the public in the place of the corporation as the owner of this property. By the reservation in question, the legislature had the right at any time to revoke the proviso exempting the company from ordinary taxation, for that was a franchise, and by such revocation freeing the company from its obligation to pay the annual sum agreed upon, to put the corporate property, with respect to taxation, on the same footing as all other property of the same kind. This we think was the entire scope of the power reserved.

Having thus disposed of this preliminary matter, we will

pass to the consideration of the case in some of its other aspects.

It will be remembered, from the epitome of the act of 1884, already given, that in imposing this state tax upon the prosecutor and its associates alone, it directs that the valuation and assessment thus rendered necessary be made, not in the common mode, by the local assessors, but by a board specially constituted for the purpose.

The establishment of this system was much criticised by counsel, a prominent argument being that it necessarily introduced inequalities in the valuation of property for taxation, and that by force of its operation such valuation was not made, as the constitution requires, by a uniform rule, but by a multiform rule. And in support of this contention the attention of the court was directed to the fact, which had been established not only by the testimony but by the report of the state board of assessors itself, that although it was the universal practice of the assessors of the different tax districts to rate property much below its real value, the state board had rated this corporate property at its true value. That this discrepancy, arising out of the practical operation of the methods of valuation, existed, was not disputed. But this result, it is manifest, was not the legal or proper result of the plan of assessment thus introduced by the legislature. That plan provided but one measure of valuation, that is, the true value of the taxable property, and that measure was to be applied alike by the local assessors and the state board; so that if both sets of officers had performed their duty, there would have obtained that unity of rule that the constitution demands. The local officers disobeyed the injunction of the law, and the contention is that the state officers should have pursued the same forbidden course, and that their acts should now be declared to be abortive because they refused to perpetrate such a malfeasance. Such an argument, in our estimation, has no force whatever; and, indeed, it seems a novel suggestion that a court should annul a proceeding because such proceeding conforms to the law. " A law," said Mr.

Justice Miller, in *Cummings* v. *National Bank*, 11 *Otto* 153, "cannot be held to be unconstitutional because, while its just interpretation is consistent with the constitution, it is unfaithfully administered by those who are charged with its execution. Their doings may be unlawful, while the statute is valid."

We perceive no reason why the legislature may not create different agencies for the valuation of property and the assessment of taxes. In point of fact, the assessors in the different districts, in matters of state taxation, are such various agencies. Nor do we think that the present law, in mere point of instrumentality, is objectionable, for it plainly appears that some unusual system of appraisal was requisite when we note the peculiar situation of the property to which it relates, and that the value of such property, as a unit, must be ascertained before it can be distributed into valued parts. All that the constitution calls for, in this particular, is that the rule of assessment shall be uniform; it does not require uniformity of mind in the application of such rule.

The taxableness of corporate franchises was another topic that was much discussed by counsel. And in this connection the rule which the board of assessors adopted, in its estimation of this species of property, was subjected to reiterated comment and pungent animadversion. The method contrived by the board, in its appraisal of this class of intangible property, was this : (1) to ascertain the amount and value of the capital stock of the corporation ; (2) the amount of the funded and other debts of the corporation and their value ; (3) the value of the tangible property ; (4) then to deduct from the aggregate amount of the valuation of the capital and funded and other debt the amount of the valuation of the tangible property ; and (5) to value the franchise at sixty per cent. of such residue.

It is not to be denied that the method thus formulated is, to a certain degree, indicative that it is the creature of the doctrine that the true value prescribed by the constitution is the value of the thing taxed to its possessor. Such, in our

judgment, would not be a proper interpretation of the constitutional phrase. True value, spoken of in that instrument, means exchangeable or cash value. An heirloom or a family picture could not be rated at its estimated worth to the owner, but at the sum it would be likely to bring at a fair sale. Consequently, when, under our laws, franchises quite similar to those of these companies, though possibly not so desirable in all respects, are obtainable at pleasure, by the use of a simple and inexpensive procedure, it would require much consideration before this court would be prepared to sanction the rule so much complained of in this case. But we do not feel that we are called on to either form or express any definite opinion in regard to this matter. The subject is not a fundamental one; for if we should condemn the method in question, the tax would not be subverted, for by the sixteenth section of the statute under consideration, provision is made for the emendation by this court of any of the assessments made by this board, as well—to use its own language— " in cases where it is claimed that the amount of the tax is excessive or insufficient, as in cases where it is claimed that the principle upon which the assessment is made is erroneous." By force of this section it would be the duty of the court, if the mode of assessment used in that instance were found to be erroneous, not to vacate the tax, but to admeasure the rate by a legal standard. But this is not the business in hand, for, at this stage of the case, we have to do only with such matters as are of vital importance.

As to the question whether corporate franchises are taxable, we think it must receive an affirmative answer. Nor, in our opinion, is the subject debatable at the present day, as the doctrine has become already accredited by so many decisions, as well of the federal as of the state courts.

The next subject that is to be disposed of by the court is one obviously of great and abiding importance. It is the question whether, by the law and constitution of this state, it is competent for the legislature, at will, to select the property of two classes of corporations and impose a tax upon such

property, at the same time exempting all other property from the burden.

It has already been shown that this act distributes the property of railroads and canals which is used in their business into four parts: that is to say—the main stem of the road, other real estate, tangible personal property, and franchises. The parts thus separated are to be severally valued, and then a certain percentage of such aggregate valuation is to be laid as a tax. The burthen thus imposed touches no other property.

It is plain that this is a property tax. It is not a rate put upon the use by these companies of this property. A tax upon the gross or net profits, or a license tax, might, perhaps, be said to partake of the nature of a tax upon such use; but here we perceive the land, tangible personal property, and the franchises, are separately valued as property and taxed as such. The act refers to the use to which the property is put as a means simply of nomination, to denote the things to be taxed. There can therefore be no doubt as to the question to be answered by the court: Can these particular lands, tangible personal property, and franchises, be set apart from all other lands, all other tangible personal property, all other franchises, and, exclusively, be burthened by a state tax?

If it is competent for the legislative power to put in force such a measure, it is plain such power is absolutely untrammeled by constitutional circumscriptions. Such an authority, if it exists, would seem to have no bounds, and to be entirely arbitrary in its nature. It cannot be questioned that a government that can choose, at pleasure, groups of property and impose, at its own will, a tax to an indefinite amount on such property, possesses in that department a truly despotic faculty. It is not to be denied that many expressions are to be found in judicial decisions, as well as in theoretical works, that would seem to sanction the doctrine that this power, even in this extreme form, is possessed by the public. Thus, it has been said the right to tax is an incident of sovereignty, and is co-extensive with that of which it is an incident. In the cele-

brated case of *McCulloch* v. *Maryland*, 4 *Wheat.* 428, it is declared that " the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the government may choose to carry it. * * * The power of the state as to the mode, form and extent of taxation is unlimited where the subjects to which it applies are within her jurisdiction."

But while such phrases as these may be said to indicate truly enough, as a general description, the nature and scope of this prerogative of sovereignty, nevertheless there are authorities of the highest character that have denied that on the general principles of jurisprudence, it is without limit. When, in the exercise of this power, a tax has been imposed without regard to the rule of national justice, that the common burden should be sustained by common contributions, and that it should be apportioned according to some ratio of equality, there have not been wanting judicial adjudications pronouncing such enactments to be void on the ground that they exact, not taxes, but forced contributions. In the case of the *State* v. *Township of Readington*, 7 *Vroom* 66, Mr. Justice Depue expresses his views on this subject with the utmost directness. He says : " The power of the legislature in the matter of taxation is said to be unlimited. Such undoubtedly is the theory of our government. But it is not every exaction made under color of taxation that can be supported as the legitimate exercise of the sovereign power of taxation. It is of the very essence of taxation that it should be equal and uniform, and that where the burden is common there should a be common contribution to discharge it." *Ib. p.* 69.

But the most signal repudiation of the doctrine that as a matter of law there is no distinction to be drawn between an arbitrary exaction and taxation, is to be found in the opinion of Mr. Justice Field, sitting in the Circuit Court of the United States, in the case of the *County of San Mateo* v. *Southern Pacific Railroad*, reported in 8 *Am. & Eng. R. R. Cas.* 1.

By the constitution of the State of California a debt secured by a mortgage was allowed to be deducted from the value of all taxable property, with the exception that such deduction should not be made in the taxation of railroad property. It will be noted how closely the case is in point, for the only difference between the reported case and the present one is that in the former the railroad company had been subjected to only a portion, though an unequal portion, of the tax, while in the present case these companies bear the entire burthen. In the case referred to, the question was whether this provision in the constitution of the state, providing for the laying of a heavier burden in the form of a tax upon railroad property than was laid on other property, was consistent with that declaration of the fourteenth amendment of the national constitution, to the effect that no state shall deny to any person within its jurisdiction "the equal protection of its laws." The distinguished jurist who presided declared, unequivocally, that the two constitutional clauses were totally incompatible, and that consequently the clause in the state constitution was void. Referring to the effect of the fourteenth amendment in this particular, the language of the opinion is as follows : "Unequal exactions, in every form or under any pretence, are absolutely forbidden ; and of course unequal taxation, for it is in that form that oppressive burdens are usually laid. It is not possible to conceive of equal protection under any system of laws when arbitrary and unequal taxation is permissible ; where different persons may be taxed on their property of the same kind, similarly situated, at different rates," &c.

Reference has not been made to this case for the purpose of bringing before us for consideration the important question that was decided by it ; that is, whether the people in their constitution, or the legislature when its powers are unrestricted, are prohibited by the federal constitution from arbitrarily selecting property for exclusive taxation. For we are not called on, in the discussion of our present theme, to express any opinion with respect to that subject, our entire object in referring to the reported case being to present, in a striking

point of view, how strongly the doctrine that the power to tax has no limits was repudiated by an enlightened jurist.

It is plain from these references that although, as a matter of theoretical statement, it was sometimes said that the legislative power to tax was unlimited, nevertheless, when it exhibited itself in any of the tyrannous forms to which it inevitably tended, it was refused recognition and enforcement by the judicial power. But if its existence was thus left in doubt, no thoughtful person failed to perceive that it was a prerogative liable to great abuse, and a standing menace to the security of private property. Hence the restrictions put upon such prerogative by so many of the states, and hence the amendment, in this particular, of our own constitution in the year 1875. We have already seen what that amendatory clause is. Its words are: "Property shall be assessed for taxes under general laws, and by uniform rules, and according to its true value."

By force of this provision, three requirements must be conformed to in every act taxing property in this state : the law must be a general one, the rule of assessment must be uniform, and the estimation of the property must be at its true value; and it is obvious that each of these requirements is a limitation of the legislative power. For, unless each be such, it has no office to perform, and is nugatory.

On the part of the state it was argued by counsel, in his criticism of this clause, that, to use the language of the brief, "if it had been the intent of the framers of this amendment of 1875, if they had intended to prohibit the exercise of the sovereign power of selection, it is submitted that such intent would have been specifically expressed, and that the word 'all,' would have been added at the beginning of the subdivision, so that it would read, 'all property shall be assessed for taxes.'"

But, in the opinion of the court, such exposition would deprive the provision of all force whatever. The word "property" in this connection must include all property, else the term loses all meaning. If we substitute for a term implying

totality, any term implying less, the sentence becomes nonsensical, as if we should read, "some property shall be taxed." Besides, if "all" property is not here required to be assessed under general laws and by a uniform rule, then it necessarily follows that *all* property is not to be assessed at its "true value." In our judgment, the clause cannot be limited upon the ground suggested.

But still it is not this term "property" that has force in establishing a restraint upon the legislative power of taxation. Instead of this it limits the effect of the amendatory clause; for by its use the clause becomes effective only when applied to property—that is, the taxing power is not restricted by the provision in general, but in its application only to property. The restraining force of the clause upon legislation resides in the terms, as has been already remarked, general laws, uniform rule and true value.

We do not doubt that under the operation of this constitutional provision the legislature can classify property for the purpose of taxing it. But we are also of opinion that the requirement that taxes upon property must be imposed under a general law, was intended to deprive, and does deprive, the law-making department of every pretence of the right to arbitrarily select property for such purpose. Its office is to prohibit arbitrary selection as contradistinguished from classification. This is the result of the mandate that the taxing act, with respect to property, must be performed by means of a general law; for a general law is one that is founded on a class. To take a part of a homogeneous mass of property, the whole being identically conditioned, and to tax such part exclusively would be an act of selection at will, and not of classification, and the law authorizing it would be a special and not a general law. In our estimation, a general law, as applied to this constitutional clause, is one that embraces the whole of a class, and not merely part of a class. Property may now, as formerly, be classed, in view of taxing it as a separate thing, but a class cannot be created at the will of the legislature, but must arise out of the nature of the things

classed. Nor can the law-maker, by the exercise of his volition, convert a fragment of a class into a class.

This discrimination between general and special statutes, as applied to a subject matter of this kind, is not a new thing to this court. It has long been a recognized doctrine with us, forming the basis of many decisions. When the case of Parsons *v.* Van Riper was first before the court, the matter was carefully considered. The inquiry in that instance was with respect to the effect of that provision of the amended constitution which forbids the legislature to pass private, local or special laws regulating the internal affairs of towns or counties, and the distinction, in view of that provision, between general and special legislation, was expressed in these words: "Interdicted local and special laws are those that rest on a false or deficient classification. Their vice is that they do not embrace all of the class to which they are naturally related; they create preferences and establish inequalities; they apply to persons, things or places possessed of certain qualities or situations, and exclude from their effect other persons, things or places that are not dissimilar in these respects." 11 *Vroom* 1. And when this case subsequently came again before the court, the same doctrine was restated and enforced. So, its propriety was acknowledged and the same rule applied in *Pell* v. *Newark*, 11 *Vroom* 71. The decision in *Rutgers* v. *New Brunswick*, 13 *Vroom* 51, rests upon the same legal principle, and in *Anderson* v. *City of Trenton*, 13 *Vroom* 486, which involved the same question, Mr. Justice Dixon declares that in order to constitute a general statute, "the class to be affected must consist of individuals distinguished by characteristics to which the purpose of the law relates, and must embrace all so characterized." To the same effect was the decision in *State* v. *Hammer*, 13 *Vroom* 434, this last case being affirmed in the Court of Errors. 15 *Vroom* 667.

From this series of cases it must be considered that what is a general law, with reference to the constitutional clause to which such cases apply, is completely settled, and at present we are simply called on to decide whether a different rule of

construction is to prevail with reference to the constitutional clause involved in the present controversy. The constitutional provision in the former case requires that the internal affairs of towns and counties shall be regulated, not by special but by general laws; in the present case the requirement is that property shall be assessed for taxes under general laws. These requirements are both restrictions upon the legislative power, and unless interpreted substantially in the sense given to one of them in the decisions above cited, they both entirely fail to accomplish that end. In our opinion, it is not possible, with any show of reason, to apply variant rules of construction, with respect to the point in question, to these two constitutional expressions. If a law that embraces only a part of a class to which it relates is, in the one case, not a general but a special act, so of necessity it must be in the other.

The result, therefore, is that when the constitution declares that property shall be assessed for taxes by a general law, it is a virtual declaration that property must be classified, upon the basis of its own nature and quality, if it is to be separately and exclusively taxed, and that a legislative fiat alone cannot make a class. That if but part of a class be, on merely arbitrary grounds, embraced in such a law, the act is special, and, as a consequence, is not consistent with the constitution.

But we do not mean, from the foregoing exposition, to imply that for the purpose of equitably apportioning a tax, the legislature may not, with that object, select groups of property that do not form a complete class, and cause to be assessed upon such groups an equable portion of a general sum directed to be raised. The exercise of such a power is unavoidable in the distribution of the burdens of taxation in the ratio of equality. Various kinds of property may be so qualified or so circumstanced that they cannot be equitably touched by a general tax in any other manner. For such a purpose property may sometimes be grouped at the legislative will, in contradistinction of being classified.

Several decisions, which have been rendered since the prevalence of the constitutional provision in question, have been

properly founded on this distinction. One of such adjudications is that of *State* v. *Yard*, 13 *Vroom* 357. The statute involved in that inquiry directed that the real and personal estate of every corporation should be taxed the same as the real and personal estate of an individual, with the exception that the provision should not apply to certain specified corporations, and it was held that such act was plainly a general law. In that case it was expressly stated that the rule as above expounded, as to what constitutes classification, was the cardinal one, but that the act in question was, in its entire frame and application, a general act. The case does not undertake to decide that the impositions which the law put upon the excepted classes were legal or constitutional. The court had a right to regard the exceptions merely as a means, often necessary in a general law, of justly distributing the common burden. We fully agree with the conclusion expressed in the opinion of the court in the case referred to, " that a law which groups into one class all other corporations cannot certainly be called a special law," and that there was no appearance in the act of any intention to evade the constitutional requirement.

The other case relied upon by the counsel of the state was .that of *Stratton* v. *Collins*, 14 *Vroom* 563, and it rests .upon the same basis. The point involved was thus presented : the general principle of the tax laws was that all real and personal property, whether owned by individuals or corporations, should be liable to taxation at its actual value ; but certain classes of corporations, and among them banks, were taken out of this rule, and put under special regulations. The shares of corporate stock were generally exempt, but the shares of the stock of banks were directed to be taxed to the owner in the township or ward in which he resided, and if he were a nonresident, then the amount of his shares to be taxed to the bank.

It will be observed that there was no special burden, by way of a separate tax, put upon these bank shares, but by the device described they were put into the general mass of taxable property, and subjected to their quota, fairly due, of the

general sum to be levied on the mass. This was plainly a grouping with the view to distribute, on grounds of equality, the common burden. And we altogether concur in the opinion expressed by the court, that under such circumstances the tax was leviable on the bank stock, and that there was no reason for supposing that the provisions of the act did not conform to the constitution. Under the general law a ratable sum was imposed on property, and these bank shares, being of a peculiar character, were assessed in a peculiar mode, there being no reason to conclude that the share exacted from this species of property was unequal or in anywise exorbitant. But let us suppose, in order to assimilate that case to this, that on this bank stock thus set apart there had been imposed, not its quota of a general tax levy, but a separate, exclusive tax—for example, the whole of this state tax—is there anything in this decision that would warrant the inference that the court, under such conditions, would have pronounced such an imposition to be a tax put upon property by a general law? There is no ground for such an inference, and while we concur in the judgment we do not find anything in it that is adverse to the rule of exposition that we have above expressed.

It is true that there were other exemptions allowed in this general tax law that was under criticism in this last-named case, and to which it may be well to advert in order to avoid misapprehension. By such general system, erected in the year 1866, certain descriptions of property, such, for instance, as were devoted to collegiate, academic, religious or charitable uses, were exempted from the tax thereby· put upon property in general. This group of exemptions was perfectly legitimate, as such property, from its devotion to public or *quasi* public uses, was thereby differentiated from ordinary property, and thus formed a class by itself. The exemption made in this system of the property of railroad companies whose charters exempted them from taxation was likewise plainly legal, as such property could not be ranked with taxable property, as it was not possessed, by force of contracts with the state, of a taxable nature. And it should also be

noticed that if the act involved in the present controversy and kindred legislation be void, such property remains, to the present hour, untaxable property, except in the chartered mode. So we also think that it is entirely admissible for groups of property, at the legislative discretion, to be with-drawn from the operation of a general property tax, for the purpose of being fairly subjected to a tax *different in kind* from such general tax; as, for example, when the general system is a tax upon property, and certain groups of persons, natural or artificial, are set apart, and burthened in the form of license or other excise tax. Such adjustments as these are, in many cases, absolutely requisite, in order to bring about an equal distribution of the burdens of taxation.

So we think that if, under a mistaken notion of the law, certain property should be deducted and set aside from the operation of a general property tax, such a mistake would not impair the act imposing the tax; for the legislative error could not have the effect of converting what, but for such error, would have been a general law, into a special one. So far we perceive no practical difficulty in the subject.

But what we are unable to assent to is the doctrine that when a general property tax exists, certain property can be subtracted from the mass of property so taxed, it being iden-tical in its nature with such mass, and thus, being arbitrarily isolated, can be subjected to a tax of the same kind—that is, to a separate property tax. With respect to the case of *New Jersey Southern R. R. Co.* v. *Railroad Commissioners,* 12 *Vroom* 235, we have but to remark that we deem it inap-plicable to the matter before us, no constitutional question hav-ing been raised by counsel or considered or decided by the court.

From this view it necessarily follows that the statute now in controversy cannot be sustained. Its effect simply is to segregate certain property from the mass of similar property; not to put upon it a proportionate part of a general tax, but to charge the part so segregated with the whole amount of a separate tax. Thus, it separates from the body of corporate franchises the corporate franchises of railroads and canal com-

panies, and taxes exclusively the part so separated, and exempts the residue. And so with the lands and tangible personal property of these particular corporations, and which denominated properties do not possess, from their nature or qualities, any different characteristics from the same kinds of property owned by other persons. We think this is plainly arbitrary selection and not classification, and that the act producing such an effect is a special and not a general law. If such a statute be valid it appears to the court that it cannot be logically denied that the power of legislative selection is absolute and on all sides unlimited, and that the only law to which it is subject is the law of its own will. For it incontestably follows that if this property of these two classes of corporate bodies can be set apart, and an entire sum be raised from it annually as a distinct tax, so may the property of any other nominated set of persons, either natural or artificial, be set apart and be subjected to a similar or greater burthen. If it be constitutional for the legislature by a law of to-day to impose this tax on the property of these two companies alone, it is not to be disputed that by a law of to-morrow an identical tax may be put exclusively upon the lands used in agriculture, or in manufacturing operations, or by mechanics or merchants in their business. Nor would such a power be confined to the imposition of state taxes, for it would obviously be effective in the imposition of all local taxation. Admit the principle and it becomes an inevitable corollary that the property used in the pottery business in the city of Trenton, could, at the legislative pleasure, be encumbered annually with the entire tax necessary to defray the expenses of that municipality. And this is precisely that exorbitance of the taxing power, the existence of which was claimed by some persons and denied by others, and which was so liable to abuse, that, as a prerogative of government, it was deprecated by all. As we have said, it was this excess in the power to tax which it was the object of the constitutional clause under discussion to curb and to confine within safe and reasonable bounds. In our opinion the provision is either entirely nugatory or else it effects this

purpose. As we have construed it, the rule thus established is of essential value, as it leans strongly to the great principle of justice that an equal ratio of the common burden of taxation shall be placed on all the same kinds of property, under similar conditions, no matter by whom such property may be used or owned.

In arriving at our conclusion we have not overlooked the fact that for a long series of years the greater part of the revenues of the state have been derived from these two classes of corporations. But this has been the result, for the greater part of the time, of the existence of those special agreements heretofore commented on, between each of these companies and the public, for the payment of a stipulated annual amount; and the acts of 1873 and 1876 appear, in some degree, to present the semblance of a continuance of such agreement in an amplified form. But the present law has not modified, but has attempted to abolish the original system, and to substitute in lieu of it a mode of taxation of an entirely different character, and the sole question is whether such mode be legal or illegal. Such an inquiry cannot be affected by the consideration whether the state will gain or lose by the decision, for the property of these companies, like that of all other persons, stands under the protection of the laws and constitution. That protection these prosecutors have the right to demand imperatively at the hands of the court.

Nor, in considering this subject, have we lost sight of the argument so much dwelt upon, that even if this state tax be an exclusive exaction from these designated companies, nevertheless it is to be remembered that they are still favored classes, inasmuch as their property, or some part of it, is exempted from certain taxation to which other property is subject.

It was confidently said that the exactions under this law would not amount to so large a sum as would result from taxing this property in the ordinary mode. This may be so, but judicially we can have no knowledge on the subject, for it is impossible for us, as the matter is placed before us, to establish an equation between the known quantity of this exaction and

the unknown quantity that would accrue from the imaginary tax suggested. Besides, if it could be ascertained that an equilibrium existed between the exaction and the compensatory exemption, it is plain the circumstance could have no effect, as such circumstance could not transmute this act, which we have declared to be special, into a general law, and such transmutation is necessary in order to validate the procedure in controversy.

In leaving this subject it is proper for us to say that every step leading us to the foregoing conclusion has been carefully examined, for we are well aware, if the result thus reached by us should be finally sustained, of the very great embarrassment and confusion that would fall upon the financial affairs of the state. But believing as we do, after full consideration, that the people of the state have declared in plain terms, in their constitution, that no property shall be arbitrarily selected for exclusive taxation, and that the present act makes such selection and imposition, we have felt constrained under the obligations of our office, no matter what the consequences may be, to pronounce such act to be unconstitutional and void.